IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
FILE NO. 1:14-CV-118

| | | |
|---|---|---|
| PARRISH NATHANIEL SLADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| TIM MONROE, in his official and individual | ) | |
| capacities, SHERIFF NEIL GODFREY, as | ) | |
| Sheriff of Moore County, in his official | ) | **COMPLAINT** |
| capacity, MOORE COUNTY JOHN AND | ) | **(Jury Trial Demanded)** |
| JANE DOES 1-5, in their official and | ) | |
| individual capacities, HOKE COUNTY | ) | |
| DEPARTMENT OF SOCIAL SERVICES, | ) | |
| HOKE COUNTY JOHN AND JANE DOES | ) | |
| 6-10, in their official and individual capacities, | ) | |
| and XYZ CORPORATION, in its capacity | ) | |
| as Surety on the Official Bond of the Sheriff | ) | |
| of Moore County, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Parrish Nathaniel Slade, complaining of Defendants, alleges, as follows:

## INTRODUCTION

1.    On May 2, 1989, Plaintiff Parrish Nathaniel Slade ("Slade") was wrongfully convicted and sentenced to life imprisonment on a charge of first-degree sex offense against an 11-year-old boy.  Slade was innocent of that charge.

2.    Slade served 22 years in prison for a crime he did not commit.

3.    Defendant Tim Monroe, then a detective with the Moore County Sheriff's Department and the lead investigator regarding the alleged crime with which Slade was charged, withheld exculpatory evidence from Slade's trial counsel.  Defendant Monroe's failure to disclose exculpatory evidence to Slade's trial counsel substantially contributed to the jury's erroneous determination that Slade was guilty of the rape of a child.  Additionally, Monroe was

in the courtroom and remained silent as the child, Arthur Carter ("Arthur"), provided testimony Monroe knew to be false. During the years in which Slade was wrongfully incarcerated, Monroe remained silent and took no action to correct the false testimony he heard Arthur offer in open court against Slade. Monroe also took no action regarding production of the exculpatory evidence (results of a medical examination contradicting the child's claim of sexual assault) to Slade or Slade's trial counsel.

4.     Slade's case was called for trial the week of May 1, 1989. Defendant Tim Monroe was called as a witness for the State. Defendant Monroe falsely testified that Arthur, the alleged victim, was _not_ seen by a doctor for injuries from an alleged sex offense purportedly committed by Slade. Defendant Monroe's testimony was a lie: Defendant Monroe knew that Arthur had undergone a medical examination that conflicted with his claim of rectal bleeding as a result of the alleged sexual assault. Defendant Monroe unlawfully failed to disclose exculpatory evidence, including results of a medical examination contradicting Arthur's claim of sexual assault. Additionally, Monroe provided false testimony against Slade and sat silent after hearing Arthur Carter testify falsely. All of these actions on the part of Monroe contributed to the jury's erroneous determination that Slade was guilty of the charge for which he was tried.

5.     Agents and employees of Defendant Hoke County Department of Social Services ("Hoke DSS") had been directly involved in checking on the safety and welfare of Arthur and his siblings due to reports and concerns of neglect on the part of his mother. As a result of its direct involvement with the family, Hoke DSS investigated Arthur's claim of sexual assault and determined that Arthur fabricated the claim of assault. Defendant Hoke County DSS withheld evidence that would have exposed discrepancies in the false claims made by Arthur, a deeply troubled 11-year-old boy. Agents and employees of Hoke County DSS knew Slade was facing a

2

trial for the offense of raping Arthur, with a potential sentence of life in prison, and also knew its own investigation of this alleged incident led Hoke DSS to conclude that the child's claim was false. Despite that knowledge, Hoke DSS adhered to an unconstitutional policy and practice of withholding critical information from those in the criminal justice system. As a result, Slade was tried for and convicted of a sexual offense which Hoke DSS officials knew had never occurred.

6.     As a direct result of Defendants' misconduct, Slade was imprisoned for 22 years and sustained physical injuries and sicknesses and other personal injuries. These included, but were not limited to, the following: physical pain and suffering; inadequate medical care; poor nutrition; severe mental anguish; emotional distress; depression; humiliation; indignities and embarrassment; damage to reputation; damage to family relationships; loss of employment, wages and benefits; diminished earning capacity; and restrictions on all forms of personal freedoms including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, family relationship, sexual relations, access to media and technology, reading, travel, enjoyment, and expression.

7.     Slade brings this civil rights action against Defendants Tim Monroe, Sheriff Neil Godfrey, Moore County John and Jane Does 1-5, Hoke DSS, Hoke County John and Jane Does 6-10, and XYZ Corporation pursuant to 42 U.S.C. § 1983 and state law. Slade brings this action against Defendants Monroe in his official and individual capacities and against Godfrey in his official capacity. Slade brings this action against Moore County John and Jane Does 1-5 in their official and individual capacities and against Hoke County John and Jane Does 6-10 in their official and individual capacities. Slade brings this action against Defendants under North Carolina law for the common law torts of obstruction of justice and negligence.

3

## JURISDICTION AND VENUE

8.      Slade brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law that deprived Slade of his liberty without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

9.      Slade's action arises under the Constitution and laws of the United States.

10.     This Court has original jurisdiction over Slade's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).  This case also arises under the common law of the State of North Carolina.  This Court has pendent jurisdiction over Slade's state law claims pursuant to 28 U.S.C. § 1367.

11.     Upon information and belief, Defendant Monroe resides in Moore County, North Carolina.

12.     Upon information and belief, Defendant Godfrey resides in Moore County, North Carolina.

13.     Upon information and belief, Defendant Hoke County DSS is a governmental entity located in Hoke County, North Carolina.

14.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Middle District of North Carolina.

## PARTIES

15.     Plaintiff Parrish Slade is a citizen and resident of Hoke County, North Carolina. Slade was born on June 16, 1966, and is now 47 years old.  Before he was imprisoned in 1989, Slade was a resident of Hoke County, North Carolina.

16.     Upon information and belief, Monroe was employed as a detective with the Moore County Sheriff's Department from 1986 until some point in the early 1990's.  Upon

4

information and belief, Monroe began his employment in the Moore County Sheriff's Department in 1980. Monroe is named as a Defendant in his individual and official capacity for acts taken under color of state law, within the course and scope of his employment with the Moore County Sheriff's Department.

17.     Defendant Godfrey currently serves as Sheriff of Moore County, North Carolina. Defendant Godfrey is sued in his official capacity. As Sheriff of Moore County, Godfrey is vested with final policymaking authority and supervisory and training responsibility for the Moore County Sheriff's Department and Moore County with respect to policing and criminal investigation.

18.     Defendants John and Jane Does 1-5 are as-yet unidentified individual employees of the Moore County Sheriff's Department who, in their official and individual capacities, were personally involved in the investigation, arrest, and/or prosecution of Parrish Slade. Some of these same individuals, upon information and belief, also had supervisory authority over Defendant Monroe.

19.     Upon information and belief, the Hoke County Department of Social Services ("Hoke DSS") is a government agency located and operating in Hoke County, North Carolina. Pursuant to law, Hoke County DSS is responsible for investigation of reports of child abuse, including allegations of sexual assaults committed upon minors.

20.     Defendants John and Jane Does 6-10 are as-yet unidentified individual employees of Hoke DSS who, in their official and individual capacities, were personally involved in the investigation of the Arthur Carter rape allegation and of Slade's innocence, yet failed to report this information to those in the criminal justice system and failed to provide exculpatory evidence to Slade's trial counsel. Some of these individuals were directly involved in the assault

5

investigation and neglected legal obligations to report their findings to authorities; others were responsible for the unconstitutional policy in place at Hoke DSS by which such information was routinely kept from criminal defendants and actors in the criminal justice system.

21.     Defendant XYZ Corporation is a fictitious name for the Surety on the official bond of Defendant Godfrey as Sheriff of Moore County pursuant to N.C. Gen. Stat. § 162-8 and § 58-76-5, whose identity is presently unknown to Plaintiff.  The true name of the corporation will be substituted for the fictitious name once the identity of same is learned.  Plaintiff is informed and believes that Defendants Godfrey, Monroe, and John and Jane Does 1-5 are protected by a bond issued by said Surety, and that the Surety is a corporation authorized to conduct business in the State of North Carolina.  Plaintiff institutes this action individually and, with respect to the claims on the official bond of Defendant Godfrey, also on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 58-76-5, et seq.

22.     At all times relevant hereto, in committing the acts and omissions herein alleged, each of the Defendants was acting within the scope of his or her employment and under color of law.

## WAIVER OF IMMUNITY

23.     Upon information and belief, Defendants are insured by one or more policies of liability insurance purchased pursuant to N.C. Gen. Stat. § 153A-435 or other applicable state law with respect to all acts and omissions complained of herein, or participate in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintain a funded reserve and to such extent, Defendants have waived any official, sovereign, qualified or governmental immunity to which they might otherwise be entitled in their official capacities.  To the extent that may be required

by law, Plaintiff hereby waives the right to a jury trial on all issues of law or fact relating to insurance coverage.

**FACTS**

**A.    Parrish Slade Is Arrested For First-Degree Sex Offense.**

24.    In the spring of 1988, 21-year-old Parrish Slade had a romantic relationship with Lydia Yvonne Carter. Slade would occasionally stay with Yvonne Carter in the trailer in Moore County where she lived with her five minor children.

25.    Arthur Carter ("Arthur") was the oldest of Yvonne Carter's five children. Arthur was 11 years old in May 1988. He was a troubled youth and had a difficult relationship with his mother. The Moore County Department of Social Services ("Moore DSS") was often involved in checking on Yvonne Carter's children, including Arthur.

26.    Arthur was in and out of Yvonne Carter's home, often having been removed from Yvonne Carter's care against her wishes by Moore DSS. Arthur much preferred to stay with his grandmother, Lydia Pride, and would misbehave so that he would be removed from his mother's trailer by officials of Moore DSS and taken to his grandmother's home.

27.    On May 17, 1988, Lydia Pride contacted the Moore County Sheriff's Department to report that her grandson Arthur had accused Slade (her daughter's boyfriend) of molesting him. Deputy B. Williams, was dispatched to Ms. Pride's home to take a report. According to Deputy Williams' Incident/Investigation Report ("Report"), Pride said Arthur had been staying at her house since May 8, 1988, after having been removed from his mother's trailer by Moore DSS on May 6, 1988. According to the Report, the offense was purportedly committed at approximately 8:00 p.m. on Friday, May 6, when Yvonne Carter had left Slade at her trailer with Arthur and his younger brothers and sisters.

7

28.     Deputy Williams attempted to contact a social worker assigned to the Carter family, Ms. Faithie Kelly of the Moore DSS, but was unable to reach her.  Deputy Williams also contacted the detective on call that night, Detective Tim Monroe of the Moore County Sheriff's Department.  The next day, May 18, 1988, Detective Monroe spoke by telephone with Lydia Pride and then met with Arthur Carter in the presence of the school principal at Aberdeen Middle School, the school Arthur attended.

29.     After speaking with Arthur on May 18, 1988, Detective Monroe drew up a warrant charging Slade with a sex offense occurring on May 6, 1988.  At the time he drew up the warrant, Detective Monroe had not spoken with Slade, had not spoken with Arthur's mother (Yvonne Carter), had not spoken with the several other children who lived at the trailer and were also purportedly there at the time of the alleged assault, and had not spoken with Faithie Kelly, the social worker assigned to the family.

30.     Slade learned that a detective had been looking for him and also that there might be charges pending against him.  Slade went to the Town of Aberdeen Police Station and was told that no one there had knowledge of any charges against him.  Slade then, voluntarily and on his own accord, went to the Moore County Sheriff's Department to investigate what he had heard.  A short while later, Slade learned that Detective Monroe was the detective investigating allegations against him.  Slade spoke with Detective Monroe and truthfully and categorically denied Arthur's allegations.

31.     Despite Slade's truthful and vehement denial of Arthur's false claims of rape, Detective Monroe arrested Slade and continued to pursue criminal charges against Slade.  In the summer of 1988, the case proceeded to the grand jury.

32.     On August 1, 1988, Detective Monroe testified before the grand jury as the State's sole witness. Slade was indicted for a sex offense alleged to have occurred on May 13, 1988.

33.     The date of the alleged offense listed in the Indictment was May 13, 1988, even though Monroe had drawn up a warrant charging Slade with a sex offense allegedly occurring on May 6, 1988. Thus, the sole alleged incident of sexual assault had two dates associated with it - (1) the May 6, 1988 date Monroe put in the arrest warrant he drew up and (2) the May 13, 1988 date in the Indictment procured through grand jury testimony at which Monroe was the sole witness. Upon information and belief, Monroe did not make the grand jury aware of the conflict with the two alleged dates of offense reported.

**B.** **Hoke County DSS Determines That Carter's Claim Was Fabricated, Yet Does Nothing As Slade Is Tried And Convicted For Rape Of A Child.**

34.     At some point after Arthur Carter's false claim of rape in May 1988 and early 1989, Yvonne Carter and her family moved from Moore County to Hoke County. Soon thereafter, the Hoke County Department of Social Services ("Hoke DSS") became actively involved with Yvonne Carter and her children.

35.     In the months after Arthur's false claim of rape against Slade, agents and employees of Hoke DSS frequently checked on the safety and welfare of Arthur and his siblings due to reports of maternal neglect and mischief and petty criminal incidents involving Arthur.

36.     On March 15, 1989, a Child Protective Services ("CPS") investigation was initiated based on a report that Arthur Carter told the reporter he was afraid to go home because his mother's boyfriend "messes with him" and tries to have sex with him. CPS investigator Donnie Bowen interviewed Arthur Carter and Yvonne Carter about the child's claim. On March 23, 1989, Bowen and Hoke County DSS Director Richard E. Travis made an official

9

determination that the report of sexual assault allegedly committed by Parrish Slade against Arthur Carter did not occur and the CPS report was determined to be "unsubstantiated."

37.     On March 23, 1989, Mr. Bowen and Hoke County DSS Director Richard E. Travis sent Yvonne Carter a letter stating: "We find the complaint to be unsubstantiated."

38.     Another Child Protective Services investigation involving Arthur Carter was initiated on April 11, 1989, this one related to neglect on the part of the child's mother, Yvonne Carter.  Yet another CPS investigation involving maternal neglect was opened April 17, 1989. Hoke DSS investigator Donnie Bowen found these complaints of maternal neglect to be substantiated and Arthur Carter was removed from his mother's care and placed in foster care by Hoke DSS.

39.     Upon information and belief, Hoke DSS investigator Donnie Bowen telephoned the Hoke County District Attorney on April 17, 1989 and was informed that no charges could be brought against Yvonne Carter for maternal neglect at that time.  Upon information and belief, Bowen telephoned Faithie Kelly -- the Moore County DSS social worker referred to in Deputy D. Williams' initial report of the sexual abuse allegation against Parrish Slade -- to determine who had custody of Arthur Carter.  During Bowen's conversation with Faithie Kelly, Bowen learned that Parrish Slade had been charged with first-degree sex offense in connection with the incident Hoke DSS investigated and determined had never occurred.  Bowen learned that Slade would be tried for first-degree sex offense in Moore County Superior Court on May 1, 1989 unless the charges were dropped.

40.     Thus, as of April 20, 1989, staff and officials of Hoke DSS knew that Slade was to be tried in Moore County Superior Court on May 1, 1989 on a charge of raping Arthur Carter,

10

the same allegation Hoke DSS personnel had investigated and determined to be fabricated and which they had therefore "unsubstantiated."

41.     Neither Mr. Bowen nor anyone else from Hoke DSS ever provided to Slade or Slade's trial counsel material information in possession of Hoke DSS which demonstrated that Arthur's claim of rape by Slade was fabricated and had been deemed "unsubstantiated."

42.     The undisclosed records show that the Hoke DSS investigated Arthur Carter's sexual abuse allegation, found the complaining child to be very troubled and willing to do "whatever it takes" to get away from the living situation with his mother, and concluded that the rape complaint was unfounded.

43.     This was the only investigation conducted by a county DSS, the agency assigned by statute with primary responsibility for investigating child sex abuse complaints.  A trained and experienced social worker employed by DSS found the rape allegation to be "unsubstantiated" and the alleged victim to be inherently untrustworthy.  None of this information was provided to Slade or his trial counsel.  Upon information and belief, none of this information was provided to the prosecutor or anyone within the criminal justice system.

44.     Additionally, upon information and belief, the undisclosed records contain pretrial statements by Arthur to Hoke DSS investigator Donnie Bowen describing the sexual abuse in terms that are materially inconsistent with Arthur's subsequent trial testimony.  Further, the undisclosed records also contain statements by Arthur to law enforcement investigators that are demonstrably false.

45.     Hoke DSS is, among other things, a law enforcement investigative agency with a legal duty to investigate suspected child sexual abuse.  N.C. Gen. Stat. § 7A-544 (1991) (repealed in 1998, superseded by §§ 7B-300, et seq.).  DSS officials had a clear legal duty to

11

report their investigative results to the District Attorney so that the District Attorney can determine if prosecution is appropriate. N.C. Gen. Stat. § 7A-548 (1991) (repealed in 1998, superseded by §§ 7B-300, et seq.)

46.     In April 1989, Hoke DSS social worker Donnie Bowen was in telephone contact with the Hoke County District Attorney and the Moore County Clerk of Court regarding Arthur Carter and knew that Slade was to be tried for a sex offense allegedly committed against Carter by Slade. By April 20, 1989, Hoke DSS knew that Slade's criminal trial was set for May 1, 1989, yet Hoke DSS officials made no contact with the Moore County District Attorney's Office regarding the Hoke DSS investigation of Arthur's rape claim and its conclusion that the claim was "unsubstantiated."

## C.     Parrish Slade Is Tried For First-Degree Sex Offense Against A Minor.

47.     The criminal case against Slade was tried on May 2, 1989. The State's case consisted of the testimony of Arthur Carter (then 12 years old), his grandmother Lydia Pride, and Detective Monroe. The State elicited testimony from Arthur and Detective Monroe that no medical examination was performed on Arthur after the alleged sexual assault. That testimony was false. A medical examination had in fact been conducted and that medical examination found no injury consistent with Arthur's claim of rape and resulting injury.

48.     On May 2, 1989, Parrish Slade was convicted on a charge of first-degree sex offense against an 11-year-old boy. Slade was sentenced to life imprisonment.

49.     The only direct evidence presented against Slade was the testimony of Arthur, the accuser. Additionally, Defendant Tim Monroe testified about his investigation of Arthur's claims. Defendant Monroe was the primary detective responsible for investigating Arthur's claim of sexual assault.

12

50.     At trial, Arthur testified that he was anally raped by Slade and that as a result of injuries he suffered during the rape he bled and continued bleeding "about a couple days."  At trial, the following exchange between Arthur and the prosecutor occurred:

> Q.     Did you tell Detective Monroe what Smooth [Parrish Slade] had done to you?
>
> A.     Yes, ma'm.
>
> Q.     What did you tell Detective Monroe?
>
> A.     I told him that Smooth raped me.
>
> Q.     Did Detective Monroe ask you some questions about it?
>
> A.     Yes, ma'm.
>
> **Q.     Have you ever been to a doctor about this?**
>
> **A.     No, ma'm.**
>
> **Q.     After Smooth did what you described to us did you see any blood on your clothes?**
>
> **A.     Yes, ma'm.**
>
> **Q.     How long was there blood on your clothes, or how long did you continue bleeding?**
>
> **A.     About a couple days.**

(Trial Transcript, 5/1/89, p. 20; emphasis added.)

51.     Detective Monroe testified at trial as follows:

> Q.     Did you talk to Arthur there at the school?
>
> A.     Yes, ma'm.  I met with him and the Principal in the Principal's office.
>
> Q.     For corroborative purposes what did Arthur tell you had occurred between him and the defendant, Parrish Slade?
>
> A.     He told me that he got sick, and he was lying -- he was at his trailer at Lee's Trailer Park in Zion's Grove community on 705 - at his mother's trailer.  He stated Mr. Slade was his mother's boyfriend.  He had been staying there about two weeks.  He said he was in the back bedroom, his bedroom.  He was lying on the bed, and Mr. Slade had come in there and turned him over.  Mr. Slade pulled his pants down.  Mr. Slade had pulled Mr. Carter's pants down, and he had stuck his penis in the victim's butt.

13

**Q.** At that time did you take the young boy to the doctor?

**A.** **No. Due to the time -- he told me he had been bleeding.** He left the next day to go to a foster home, and he didn't tell nobody about it until he got to his grandmother's house, and he told her. He stated to me that he was afraid to tell anybody. He said his mother wouldn't believe him. I briefly talked to him about the problems he had been having at home, between him and his mother, and the reason why he was placed in a foster home.

**Q.** **But to your knowledge he did not go to a doctor.**

**A.** **No, ma'm. He was never taken.**

Q. Did you talk to Mrs. Lydia Pride, the child's grandmother?

A. Yes, ma'm, I did.

Q. When did you talk to Mrs. Pride?

A. I talked to her on the phone the 18th, and then I think the following Monday I talked to her again. I sat down and talked to her more.

Q. For corroborative purposes what if anything did Lydia Pride tell you about the incident between the defendant and her eleven year old grandson?

A. She told me Arthur had come to stay with her, and he had told her that Slade, or Smooth - he called him Smooth - had messed with him in his butt. He said he put his thing in his butt. I talked to Mrs. Pride and got Smooth's correct name. On the first report where it came down through Social Services they had him as Parrish Lake or Parrish Slade. They didn't know his correct name. I got the correct name from her and his address so I could draw a Warrant.

(Trial Transcript, 5/1/89, pp. 31-33; emphasis added.)

## D. Twenty-Two Years Later, Slade's Conviction Is Overturned Due To The Unconstitutional Suppression Of Material Favorable Evidence And The Uncorrected Presentation Of False Testimony.

52. On December 8, 2008, a Motion for Appropriate Relief ("MAR") was filed on Slade's behalf. The MAR sought relief based primarily on the presentation of false testimony at trial and the failure to disclose exculpatory evidence. The MAR presented evidence that two months after Slade's trial, Monroe acknowledged that Arthur had in fact been examined by a doctor after the alleged rape. Monroe made that acknowledgment in speaking with a Department of Correction ("DOC") official who was preparing an "Official Crime Version" report.

14

53.     The DOC document titled "Official Crime Version" was dated July 3, 1989 and included information that could have been provided only by Detective Monroe. The memorandum states that the date of the alleged offense was May 6, 1988 and included details regarding a medical examination that conflicted with Carter's claim of rectal bleeding. The report reads:

> A doctor did examine the child and two weeks after the assault could only see bruising.

The memorandum states that information reported therein was obtained from the Moore County Clerk of Court's Office and Detective Timothy Monroe. The statement quoted above regarding Arthur's examination by a physician does not appear anywhere in the court file or otherwise in the public record. That information could have only been provided by Monroe. A true and accurate copy of this memorandum is attached hereto as Exhibit A.

54.     On March 29, 2010, an Amendment to Motion for Appropriate Relief was filed. The Amendment set forth additional grounds for relief based on the undisclosed DSS records.

55.     On June 14, 2011, the Honorable John O. Craig, III entered an Order Granting Appropriate Relief. Judge Craig set aside Slade's conviction and granted him a new trial.

56.     The Order Granting Appropriate Relief includes the following findings related to the false testimony offered by Monroe and the child victim:

> (52)   It has been proven by a preponderance of the evidence that Arthur Carter was examined by a medical doctor on or about Friday, May 20, 1988, and the doctor found no evidence of rectal injury, only some unspecified bruising.
>
> (53)   This information was materially favorable to the defense.
>
> (54)   It has been proven by a preponderance of the evidence that Detective Monroe was aware of the medical examination at the time of trial, that either the doctor's medical report or an investigative note to that effect was in the State's possession at the time of trial, and that this was not disclosed to the defense.

15

(55)     Arthur Carter's and Detective Monroe's testimony that Arthur was never seen by a doctor in reference to the alleged sexual assault by Mr. Slade was false.

(56)     In light of the State's contention that Arthur Carter was forcibly anally raped on May 13, 1988 resulting in an injury causing two days of rectal bleeding, and the absence of any substantial evidence of a crime beyond Arthur's Carter's own testimony, there is a reasonable likelihood that the judgment of the jury could have been affected by the false testimony.

(57)     In light of the same considerations, there is a reasonable probability, sufficient to undermine this Court's confidence in the verdict, that the outcome of the trial would have been different but for the State's failure to disclose this information to the defense.

57.     The Findings related to the failings of Hoke DSS included the following:

(66)     By the time of Mr. Slade's trial on May 1, 1989, Mr. Bowen was aware that Mr. Slade was on trial in Moore County on the charge of sexual abuse as to which Mr. Bowen had interviewed Arthur Carter on March 17, 1989.

(67)     Mr. Bowen was aware of his duty to provide prosecuting authorities with any evidence discovered during a CPS investigation that would substantiate a criminal charge of child sexual abuse.  However, it was policy of the Hoke County DSS not to disclose unsubstantiated investigations to anyone, including a District Attorney's Office, without a court order.  Mr. Bowen was not aware of the constitutional requirement that the State disclose exculpatory and impeachment evidence to the defense.

(69)     In failing to disclose Exhibits 7, 8 and 9 to the Moore County District Attorney's office and Mr. Slade's defense counsel, Mr. Bowen acted in good faith and in accordance with Hoke County DSS policy. Nevertheless, Exhibits 7, 8 and 9 were materially favorable to Mr. Slade, they were in the possession of the State, and they were not disclosed to the defense.

58.     In the Order Granting Appropriate Relief, Judge Craig concluded that Slade was entitled to a new trial based on the violation of his constitutional rights.  The Court specifically referenced the violation of Slade's rights with respect to the State's knowing presentation and failure to correct materially false testimony in violation of <u>Napue v. Illinois</u>, 360 U.S. 264

16

(1959), and the failure to disclose exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

59.     Slade, through counsel, then moved to dismiss the criminal charges.  In an Order filed on December 27, 2012, the Honorable Anderson D. Cromer granted that motion based on the violations of Slade's constitutional rights.

60.     In the Order, Judge Cromer noted that due to the <u>Napue</u> and <u>Brady</u> violations, it was now "impossible for defendant to evaluate and present medical evidence in the event of retrial."  No records related to the medical examination could be found.  The Court noted that Slade's "ability to obtain appellate or post-conviction relief and a new trial has been delayed for over twenty years in large part by the State's undisclosed <u>Napue</u> and <u>Brady</u> violations."  (Order, ¶ 14.)

61.     Judge Cromer concluded that Slade's constitutional rights were violated, that irreparable prejudice had been caused with respect to preparation of his case, and that no remedy for that irreparable prejudice existed but to dismiss the prosecution.  Judge Cromer ordered that the charge be dismissed with prejudice.

<u>**CAUSES OF ACTION**</u>

**I.     FEDERAL LAW CLAIMS.**

    **A.     CLAIMS UNDER 42 U.S.C. § 1983 FOR VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

        <u>COUNT I: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (MONROE)</u>

62.     The allegations in the preceding paragraphs are incorporated by reference.

63.     Monroe intentionally and in bad faith withheld material exculpatory evidence by failing to disclose that Arthur Carter had undergone a medical examination within two weeks

17

after the alleged rape and that the medical examination revealed no injury consistent with the child's claim of anal rape and resulting injury.

64.     In withholding exculpatory evidence, Monroe acted with reckless indifference to Slade's constitutional rights.

65.     When Monroe withheld the exculpatory evidence, he could reasonably foresee that the failure to disclose the evidence would result in Slade's conviction.

66.     Monroe's intentional withholding of exculpatory evidence was a direct and proximate cause of Slade's conviction and his subsequent imprisonment.

67.     Because Monroe intentionally withheld exculpatory evidence, Slade was imprisoned for 22 years for a crime he did not commit.

68.     Monroe was acting under color of state law when he withheld the exculpatory evidence.

69.     Monroe's intentional withholding of exculpatory evidence deprived Slade of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

70.     Because Monroe intentionally withheld exculpatory evidence, Monroe is liable in his individual capacity to Slade for compensatory damages under 42 U.S.C. § 1983.

71.     In each year after Slade's conviction, including 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012, Monroe, acting under color of state law, intentionally and in bad faith withheld the exculpatory evidence regarding a medical examination which contradicted Arthur Carter's fabricated claim of anal rape and resulting injury.  If he had disclosed the exculpatory

evidence, Slade would have obtained post-conviction relief and avoided additional time in prison.

72.     Monroe's intentional withholding of the exculpatory evidence from 1989 through 2012 deprived Slade of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

73.     Because Monroe intentionally withheld the exculpatory evidence from 1989 through 2012, in reckless indifference to Slade's constitutional rights, Monroe is liable in his individual capacity to Slade for damages under 42 U.S.C. § 1983.

### COUNT II: FAILURE TO CORRECT MATERIALLY FALSE TESTIMONY (MONROE)

74.     The allegations in the preceding paragraphs are incorporated by reference.

75.     Monroe was present in the courtroom and heard Arthur Carter provide testimony Monroe knew to be false.  Specifically, Monroe witnessed Arthur testify during Slade's criminal trial that Arthur had <u>not</u> undergone a medical examination after the alleged incident while Monroe knew Arthur had in fact been examined by a physician and that the medical examination revealed no injury consistent with Arthur's claim of anal rape.

76.     Monroe was obligated to correct testimony by a witness for the State that he heard and knew to be false.  In intentionally failing to correct Arthur's false testimony, Monroe acted with reckless indifference to Slade's constitutional rights.  In doing so, Monroe could reasonably foresee that the uncorrected false testimony would result in Slade's conviction.

77.     Monroe's failure to correct the false testimony was a direct and proximate cause of Slade's conviction and his subsequent wrongful incarceration.

78. Because Monroe failed to correct or otherwise take any action to mitigate the child accuser's false testimony, Slade was imprisoned for 22 years for a crime he did not commit.

79. Monroe was acting under color of state law when he failed to correct Arthur's false testimony and allowed it to be presented to the jury as true.

80. Monroe's actions deprived Slade of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution. As a result, Monroe is liable in his individual capacity to Slade for damages under 42 U.S.C. § 1983.

81. In each year after Slade's conviction, including 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012, Monroe, acting under color of state law, intentionally and in bad faith failed to correct Arthur's false testimony at Slade's trial. If he had done so, Slade would have obtained post-conviction relief and avoided additional time in prison.

82. Monroe's intentional failure to correct Arthur's false testimony between 1989 and 2012 deprived Slade of his liberty without due process in violation of the Fourteenth Amendment to the United States Constitution.

83. Because Monroe intentionally failed to correct Arthur's false testimony, in reckless indifference to Slade's constitutional rights, Monroe is liable in his individual capacity to Slade for damages under 42 U.S.C. § 1983.

## COUNT III: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (HOKE COUNTY DSS)

84. The allegations in the preceding paragraphs are incorporated by reference.

85.     By statute, Hoke DSS was obligated to investigate the allegation of sexual assault against Arthur Carter.   Hoke DSS was further obligated to report to the District Attorney regarding the merit -- or lack of merit -- of the abuse claim.

86.     Hoke DSS investigated Arthur's charge and determined that it was fabricated. Despite actual knowledge of discrepancies in Arthur's claims and his lack of veracity, Hoke DSS officials failed to inform the Moore County District Attorney of exculpatory evidence in the possession of Hoke DSS.

87.     Upon information and belief, Hoke DSS adhered to an unconstitutional practice or policy of failing to disclose exculpatory evidence in its possession.

88.     Hoke DSS withheld exculpatory evidence in spite of actual knowledge that Slade would be tried for a serious criminal charge that Hoke DSS had determined was untrue based on facts and circumstances unknown to the prosecution or defense in Moore County.

89.     In withholding exculpatory evidence, Hoke DSS acted with reckless indifference to Slade's constitutional rights.

90.     When Hoke DSS withheld the exculpatory evidence, it could reasonably foresee that the failure to disclose the evidence would result in Slade's conviction.

91.     The intentional withholding of exculpatory evidence by Hoke DSS was a direct and proximate cause of Slade's conviction and his subsequent imprisonment.

92.     Because Hoke DSS intentionally withheld exculpatory evidence, Slade was imprisoned for 22 years for a crime he did not commit.

93.     Hoke DSS and its officials were acting under color of state law when they withheld the exculpatory evidence.

94.     The actions of Hoke DSS and its officials in intentionally withholding exculpatory evidence deprived Slade of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

95.     Because Hoke DSS and its officials intentionally withheld exculpatory evidence and had a policy of failing to disclose exculpatory evidence to the District Attorney, Hoke DSS is liable to Slade for damages under 42 U.S.C. § 1983.

96.     In each year after Slade's conviction, including 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012, Hoke DSS, acting under color of state law, intentionally and in bad faith withheld exculpatory evidence.  If Hoke DSS and its officials had disclosed the exculpatory evidence in their possession, Slade would have obtained post-conviction relief and avoided additional time in prison.

97.     The actions of Hoke DSS and its officials in intentionally withholding exculpatory evidence from 1989 through 2012 deprived Slade of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

98.     Because Hoke DSS and its officials intentionally withheld the exculpatory evidence from 1989 through 2012, in reckless indifference to Slade's constitutional rights, Hoke DSS is liable to Slade for damages under 42 U.S.C. § 1983.

## COUNT IV: *MONELL* CLAIM (SHERIFF NEIL GODFREY)

99.     The allegations in the preceding paragraphs are incorporated by reference.

100.    Defendant Neil Godfrey currently serves as Sheriff of the Moore County Sheriff's Department.  In that capacity, Defendant Godfrey is the final policymaker with respect to law enforcement and criminal investigations under the jurisdiction of the Moore County Sheriff's Department.  Defendant Godfrey is the final policymaker for Moore County and his actions and omissions constituted policy decisions that had the County's "stamp of approval."  Defendant Godfrey, in his official capacity, is liable for all actions of his and his predecessors as Sheriff of Moore County which resulted in Slade's wrongful conviction or extended the period of his wrongful incarceration.

101.    As final policymaker for Moore County, Defendant Godfrey created, promulgated, and maintained the following policies which deprived Plaintiff Slade of his constitutional rights, including but not limited to, his due process rights and the right to not be subject to improper deprivations of liberty and the pursuit of happiness:

      (a)     Defendant Godfrey and his predecessors created, promulgated, and maintained a policy of failing to disclose exculpatory evidence;

      (b)     Defendant Godfrey and his predecessors created, promulgated, and maintained a practice or policy of deficient investigation of serious crimes;

      (c)     Defendant Godfrey and his predecessors failed to have in place policies and procedures requiring investigating officers to disclose all exculpatory evidence to an accused or his or her counsel; and

      (d)     In other respects to be proved through discovery and at trial.

102.    As a direct result of the policies described above, Parrish Slade was wrongly convicted, imprisoned for 22 years, and suffered all of the physical, emotional and pecuniary damages set forth above.

103.     Because Godfrey and his predecessors created, promulgated, and maintained unconstitutional policies in violation of Slade's constitutional rights, Godfrey is liable in his official capacity to Slade for damages under 42 U.S.C. § 1983.

### COUNT V: SUPERVISORY LIABILITY (GODFREY, MOORE COUNTY JOHN AND JANE DOES 1-5 IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES)

104.     The allegations in the preceding paragraphs are incorporated by reference.

105.     Defendants Godfrey, and Moore County John and Jane Does 1-5, all state actors acting deliberately and/or recklessly with deliberate indifference, and under color of law, were, at all relevant times, supervisory personnel within the Moore County Sheriff's Department with responsibility for the hiring, training, screening, oversight, supervision, and discipline of Monroe.

106.     These supervisory Defendants, upon information and belief, knew or should have known before May 1988, that Monroe and other detectives with the Moore County Sheriff's Department were producing false and/or misleading investigative reports, providing false testimony at trials, and failing to disclose material exculpatory evidence, thus depriving suspects of their rights to due process of law.

107.     These supervisory Defendants, with knowledge of deficiencies in the performance of Detective Monroe and other detectives with the Moore County Sheriff's Department, failed to take any corrective action.  As a result, deficient investigations of crimes continued in a way that violated the constitutional rights of suspects.

108.     As a direct result of the failure of these Defendants to perform their supervisory duties, Parrish Slade was wrongly convicted, imprisoned for 22 years, and suffered all of the physical, emotional and pecuniary damages set forth above.

109.     Because of John and Jane Does 1-5's acts and omissions in reckless indifference to Slade's constitutional rights, John and Jane Does 1-5 are liable in their individual capacities to Slade for damages under 42 U.S.C. § 1983.

## II.     STATE LAW CLAIMS.

### A.     CLAIMS UNDER THE NORTH CAROLINA CONSTITUTION.

COUNT VI: INTENTIONAL MISREPRESENTATION OF EVIDENCE (MONROE)

110.     The allegations in the preceding paragraphs are incorporated by reference.

111.     Monroe intentionally and in bad faith misrepresented evidence against Slade by presenting false testimony.  Specifically, Monroe intentionally and in bad faith misrepresented the evidence by testifying, contrary to known facts, that Arthur Carter had not undergone a medical examination within a short time after the alleged sexual assault committed by Slade.

112.     At the time Monroe testified at Slade's criminal trial on May 1, 1989, Monroe knew that Arthur had been examined by a medical doctor within a short time after the alleged assault.  Monroe was asked at trial whether Arthur had been taken to a doctor in connection with the alleged assault and Monroe testified: "No, ma'am, he was never taken."  Monroe's testimony denying that Arthur had been seen by a medical professional was material and went to a critical issue.  Monroe's testimony was false and constitutes intentional misrepresentation of evidence.

113.     In intentionally misrepresenting evidence against Slade, Monroe acted with reckless indifference to Slade's constitutional rights.

114.     When Monroe intentionally misrepresented evidence against Slade, Monroe could reasonably foresee that the misrepresentation would result in Slade's conviction.

115.     Monroe's intentional misrepresentation of evidence against Slade was a direct and proximate cause of Slade's conviction and his subsequent wrongful incarceration.

25

116.   Because Monroe intentionally misrepresented evidence against Slade, Slade was imprisoned for 22 years for a crime he did not commit.

117.   Monroe was acting under color of state law when he intentionally misrepresented evidence against Slade.

118.   Monroe's intentional misrepresentation of evidence deprived Slade of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

119.   Because Monroe intentionally misrepresented evidence against Slade, Monroe is liable in his official capacity to Slade for damages under the North Carolina Constitution.

120.   In each year after Slade's conviction, including 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012, Monroe, acting under color of state law, intentionally and in bad faith failed to correct the inaccurate and untruthful testimony evidence he had offered at Slade's trial. If he had done so, Slade would have obtained post-conviction relief and avoided additional time in prison.

121.   Monroe's intentional failure to correct his untruthful testimony between 1989 and 2012 deprived Slade of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to his rights under Article I, Section 19 and Article I, Section 21.

122.   Because Monroe intentionally failed to correct the untruthful testimony and evidence he had provided from 1989 through 2012, in reckless indifference to Slade's constitutional rights, Monroe is liable in his official capacity to Slade for damages under the North Carolina Constitution.

26

## COUNT VII: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (MONROE)

123.    The allegations in the preceding paragraphs are incorporated by reference.

124.    Monroe intentionally and in bad faith withheld material exculpatory evidence by failing to disclose that Arthur Carter had undergone a medical examination after the alleged rape and that Arthur's medical examination revealed no injury consistent with the child's claim of anal rape and resulting injury.

125.    In withholding exculpatory evidence, Monroe acted with reckless indifference to Slade's constitutional rights.

126.    When Monroe withheld the exculpatory evidence, he could reasonably foresee that the failure to disclose the evidence would result in Slade's conviction.

127.    Monroe's intentional withholding of exculpatory evidence was a direct and proximate cause of Slade's conviction and his subsequent imprisonment.

128.    Because Monroe intentionally withheld exculpatory evidence, Slade was imprisoned for 22 years for a crime he did not commit.

129.    Monroe was acting under color of state law when he withheld the exculpatory evidence.

130.    Monroe's intentional withholding of exculpatory evidence deprived Slade of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to rights under Article I, Section 19 and Article I, Section 21.

131.    Because Monroe intentionally withheld exculpatory evidence, Monroe is liable in his official capacity to Slade for compensatory damages under the North Carolina Constitution.

132.    In each year after Slade's conviction, including 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012, Monroe, acting under color of state law, intentionally and in bad faith withheld the exculpatory evidence regarding a medical examination which contradicted Arthur's fabricated claim of anal rape and resulting injury.  If he had disclosed the exculpatory evidence, Slade would have obtained post-conviction relief and avoided additional time in prison.

133.    Monroe's intentional withholding of exculpatory evidence from 1989 through 2012 deprived Slade of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to rights under Article I, Section 19 and Article I, Section 21.

134.    Because Monroe intentionally withheld the exculpatory evidence from 1989 through 2012, in reckless indifference to Slade's constitutional rights, Monroe is liable in his official capacity to Slade for damages under the North Carolina Constitution.

## COUNT VIII: FAILURE TO DISCLOSE EXCULPATORY EVIDENCE (HOKE DSS)

135.    The allegations in the preceding paragraphs are incorporated by reference.

136.    Hoke DSS, pursuant to an improper and unconstitutional practice or policy of failing to disclose exculpatory evidence in its possession, failed to disclose the results of its investigation of the rape allegation and its determination that Arthur Carter had fabricated the claim.  Hoke DSS improperly withheld evidence regarding its determination that the rape allegation was fabricated and that Hoke DSS had determined the claim was "unsubstantiated" for that reason.

137. Hoke DSS withheld exculpatory evidence in spite of actual knowledge that Slade would be tried for a serious criminal charge that Hoke DSS had determined was untrue based on facts and circumstances unknown to the prosecution or defense in Moore County.

138. In withholding exculpatory evidence, Hoke DSS acted with reckless indifference to Slade's constitutional rights.

139. When Hoke DSS withheld the exculpatory evidence, it could reasonably foresee that the failure to disclose the evidence would result in Slade's conviction.

140. The intentional withholding of exculpatory evidence by Hoke DSS was a direct and proximate cause of Slade's conviction and his subsequent imprisonment.

141. Because Hoke DSS intentionally withheld exculpatory evidence, Slade was imprisoned for 22 years for a crime he did not commit.

142. The actions of Hoke DSS in intentionally withholding exculpatory evidence deprived Slade of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to rights under Article I, Section 19 and Article I, Section 21.

143. Because Hoke DSS intentionally withheld exculpatory evidence, Hoke DSS is liable to Slade for compensatory damages under the North Carolina Constitution.

144. In each year after Slade's conviction, including 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, and 2012, Hoke DSS intentionally withheld the exculpatory evidence regarding the results of its investigation of the rape allegation. If Hoke DSS had disclosed the exculpatory evidence, Slade would have obtained post-relief and avoided additional time in prison.

29

145.    The actions of Hoke DSS in intentionally withholding exculpatory evidence from 1989 through 2012 deprived Slade of his liberty without due process of law in violation of his rights under the North Carolina Constitution, including but not limited to rights under Article I, Section 19 and Article I, Section 21.

146.    Because Hoke DSS intentionally withheld the exculpatory evidence from 1989 through 2012, in reckless indifference to Slade's constitutional rights, Hoke DSS is liable to Slade for damages under the North Carolina Constitution.

**B.    NORTH CAROLINA TORT CLAIMS.**

<u>COUNT IX: OBSTRUCTION OF JUSTICE (MONROE)</u>

147.    The allegations in the preceding paragraphs are incorporated by reference.

148.    Monroe prevented, obstructed, impeded and hindered public or legal justice by engaging in the acts set forth above, including but not limited to:

    (a)    Intentionally misrepresenting evidence against Slade by falsely testifying that Arthur Carter had not undergone a medical examination following the alleged assault;

    (b)    Intentionally withholding material exculpatory evidence by failing to disclose the fact of and results of the medical examination Arthur Carter underwent following the alleged sexual assault;

    (c)    Intentionally failing to correct the false testimony offered by Arthur Carter;

    (d)    Intentionally failing to alert the prosecutor or Slade's counsel that Arthur Carter had testified falsely at trial;

    (e)    In each year from 1990 through 2012, intentionally failing to disclose the misrepresentation of evidence and the withholding of exculpatory evidence in Slade's case; and

    (f)    In such other ways as may be shown by the evidence.

149.    As a direct, proximate and foreseeable result of Monroe's obstruction of justice, Slade was deprived of a fair trial and imprisoned for 22 years for a crime he did not commit.

### COUNT X: OBSTRUCTION OF JUSTICE (HOKE COUNTY DSS)

150.    The allegations in the preceding paragraphs are incorporated by reference.

151.    Hoke DSS prevented, obstructed, impeded and hindered public or legal justice by engaging in the acts set forth above, including but not limited to:

(a)    Intentionally withholding material exculpatory evidence by failing to disclose that it conducted an investigation of Arthur Carter's rape allegation and concluded that the charge was "unsubstantiated;"

(b)    Intentionally withholding material exculpatory evidence by failing to disclose known and obvious inconsistencies in Arthur Carter's claim of assault regarding Slade;

(c)    In each year from 1990 through 2012, intentionally failing to disclose the wrongful withholding of exculpatory evidence in Slade's case; and

(d)    In such other ways as may be shown by the evidence.

### COUNT XI: NEGLIGENCE (HOKE COUNTY DSS, MONROE, GODFREY, AND JOHN AND JANE DOES 1-10)

152.    The allegations in the preceding paragraphs are incorporated by reference.

153.    Defendants had a duty to properly investigate the allegations made against Slade and to inform the District Attorney and Slade's attorney of the results of the investigation. Those Defendants with supervisory authority had a duty to see that subordinates properly carried out their duties. Those Defendants with policy-making authority had an obligation to ensure that proper policies were in place so that investigations of serious criminal matters would be properly investigated and reported.

154.    Defendants were negligent and breached legal obligations owing to the public and criminal defendants such as Parrish Slade. Defendants were negligent in the following respects:

31

(a) They failed to conduct a proper and reasonable investigation of the sexual assault allegation made against Parrish Slade;

(b) They failed to inform those in the criminal justice system, including the prosecutor and Slade's attorney, of exculpatory evidence;

(c) They failed to adhere to established obligations to disclose exculpatory evidence;

(d) They failed to enact and follow proper policies and procedures so as to ensure that criminal defendants received access to exculpatory evidence; and

(e) In other respects to be proved through discovery an at trial.

155. As a direct and proximate result of the negligence of Defendants, Slade was subjected to a criminal prosecution for a crime he did not commit and was wrongfully convicted.

156. Slade suffered damages as a direct and proximate result of the negligence of Defendants.

157. Upon information and belief, Hoke County has procured a policy of liability insurance that covers agents and employees of Hoke County DSS, waiving the defense of sovereign immunity. Likewise, upon information and belief, Moore County has procured a policy of liability insurance which covers agents, employees, and deputies of the Moore County Sheriff's Department, waiving the defense of sovereign immunity with respect to these individuals.

## COUNT XII: LIABILITY ON OFFICIAL BOND (GODFREY AND MOORE COUNTY JOHN AND JANE DOES 1-5)

158. The allegations in the preceding paragraphs are incorporated by reference.

159. Plaintiff is informed and believes that Defendant Godfrey, as required by statute, has furnished a bond or bonds payable to the State of North Carolina (upon whose relation Plaintiff sues) conditioned upon the faithful exercise of the duties of his office.

32

160.     Plaintiff is informed and believes that Defendant XYZ Corporation was, at all times relevant to this action, the Surety on the official bond of Defendant Godfrey as Sheriff of Moore County, North Carolina.

161.     Plaintiff has been injured by the neglect, misconduct, and misbehavior of Defendant Godfrey, acting in his capacity as Sheriff of Moore County, and Defendants Monroe and John and Jane Does 1-5, acting in their capacities as deputies or employees of Moore County.

162.     Pursuant to N.C. Gen. Stat. § 58-76-5, Defendants and the Surety on their bond are liable to Plaintiff for all acts done by Defendant Godfrey or his deputies or employees by virtue of or under color of their office.

## DAMAGES

163.     As a direct and proximate result of Defendants' violation of Slade's civil and constitutional rights, obstruction of justice, and negligence, Slade was arrested, deprived of a fair trial, wrongfully convicted, and imprisoned for 22 years for a crime he did not commit.

164.     As a result of Slade's wrongful conviction and imprisonment, Slade sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages.  Those injuries include but are not limited to:

(a)     inadequate medical care;
(b)     poor nutrition;
(c)     physical pain and suffering;
(d)     severe emotional distress;
(e)     depression;
(f)     humiliation, indignities and embarrassment;
(g)     damage to reputation;
(h)     damage to family relationships;
(i)     loss of employment, wages and benefits;
(j)     diminished earning capacity;
(k)     restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic

33

opportunity, physical activity, personal fulfillment, parental responsibilities, family relations, sexual relations, access to media and technology, reading, travel, enjoyment, and expression; and

(l)     such other injuries as may be shown by the evidence.

165.     Defendants are jointly and severally liable to Slade for compensatory and punitive damages resulting from the violation of his civil rights, obstruction of justice, negligence, and wrongful conduct as described herein.

166.     Slade is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Based on the foregoing, Slade prays for the following relief:

1.     Compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial;

2.     Punitive damages from Defendants, jointly and severally, in an amount to be determined at trial;

3.     Judgment against Defendant XYZ Corporation for such sums as it may be obligated to pay upon Defendants' official bond(s), on account of Defendants' neglect, misconduct, and misbehavior in office as alleged above;

4.     Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988;

5.     Costs of court and interest as allowed by law;

6.     A trial by jury on all contested issues of fact; and

7.     Such other and further relief as the Court may deem just and proper.

34

This the 7th day of February, 2014.

MARTIN & JONES, PLLC

BY:/s/ G. Christopher Olson
    E. Spencer Parris, NCSB 11042
    esp@m-j.com
    G. Christopher Olson, NCSB 21223
    gco@m-j.com
    410 Glenwood Avenue, Suite 200
    Raleigh, North Carolina 2760
    (919) 821-0005

PATTERSON HARKAVY, LLP

BY:/s/ Narendra K. Ghosh
    Burton Craige, NCSB 9180
    bcraige@pathlaw.com
    Narendra K. Ghosh, NCSB 37649
    nghosh@pathlaw.com
    1312 Annapolis Drive, Suite 103
    Raleigh, North Carolina 27608
    (919) 755-1812

**ATTORNEYS FOR PLAINTIFF**
**PARRISH NATHANIEL SLADE**